1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RAYMOND NEWSON,                      No.  2:18-cv-2010 CKD P

12              Plaintiff,

13         v.                             ORDER AND

14    STEPHEN SHAW, et al.,               FINDINGS AND RECOMMENDATIONS

15              Defendants.

16

17         Plaintiff is proceeding pro se.  At all times relevant, plaintiff was a prisoner at the

18    California Medical Facility and defendants Shaw and Ikegbu were employed there as physicians.

19    The claims which remain arise under the Eighth Amendment and California tort law.  ECF No. 9

20    & 18.  Defendants motion for summary judgment is before the court.

21    I.  Standards

22         A.  Summary Judgment

23         Summary judgment is appropriate when it is demonstrated that there "is no genuine

24    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

25    Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

26    "citing to particular parts of materials in the record, including depositions, documents,

27    electronically stored information, affidavits or declarations, stipulations (including those made for

28    /////

1

1    purposes of the motion only), admissions, interrogatory answers, or other materials. . .” Fed. R.

2    Civ. P. 56(c)(1)(A).

3         Summary judgment should be entered, after adequate time for discovery and upon motion,

4    against a party who fails to make a showing sufficient to establish the existence of an element

5    essential to that party's case, and on which that party will bear the burden of proof at trial.  See

6    Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an

7    essential element of the nonmoving party's case necessarily renders all other facts immaterial."

8    Id.

9         If the moving party meets its initial responsibility, the burden then shifts to the opposing

10   party to establish that a genuine issue as to any material fact exists.  See Matsushita Elec. Indus.

11   Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of

12   this factual dispute, the opposing party may not rely upon the allegations or denials of their

13   pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

14   admissible discovery material, in support of its contention that the dispute exists or show that the

15   materials cited by the movant do not establish the absence of a genuine dispute.  See Fed. R. Civ.

16   P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in

17   contention is material, i.e., a fact that might affect the outcome of the suit under the governing

18   law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v.

19   Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

20   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

21   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

22        In the endeavor to establish the existence of a factual dispute, the opposing party need not

23   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

24   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

25   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

26   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

27   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

28   amendments).

1   In resolving the summary judgment motion, the evidence of the opposing party is to be

2   believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

3   facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

4   U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

5   obligation to produce a factual predicate from which the inference may be drawn.  See Richards

6   v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

7   (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

8   simply show that there is some metaphysical doubt as to the material facts . . ."  "Where the

9   record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

10  there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

11         B.   Eighth Amendment Denial or Delay of Medical Care

12  Denial or delay of medical care can violate the Eighth Amendment.  Estelle v. Gamble,

13  429 U.S. 97, 104-05 (1976).  A violation occurs when a prison official causes injury as a result of

14  his or her deliberate indifference to a prisoner's serious medical needs.  Id.

15  A plaintiff can show a "serious medical need" by demonstrating that "failure to treat a

16  prisoner's condition could result in further significant injury or the 'unnecessary and wanton

17  infliction of pain.'"  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) citing Estelle, 429 U.S. at

18  104.  "Examples of serious medical needs include '[t]he existence of an injury that a reasonable

19  doctor or patient would find important and worthy of comment or treatment; the presence of a

20  medical condition that significantly affects an individual's daily activities; or the existence of

21  chronic and substantial pain.'"  Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) citing

22  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1991).

23  "Deliberate indifference" includes a purposeful act or failure to respond to a prisoner's

24  pain or possible medical need.  Jett, 439 F.3d at 1096.

25  A showing of merely negligent medical care is not enough to establish a constitutional

26  violation.  Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-

27  106.  A difference of opinion about the proper course of treatment is not deliberate indifference,

28  nor does a dispute between a prisoner and prison officials over the necessity for or extent of

3

1 medical treatment amount to a constitutional violation.  See, e.g., Toguchi v. Chung, 391 F.3d

2 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  Furthermore,

3 mere delay of medical treatment, "without more, is insufficient to state a claim of deliberate

4 medical indifference."  Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.

5 1985).  Where a prisoner alleges that delay of medical treatment evinces deliberate indifference,

6 the prisoner must show that the delay caused "significant harm and that defendants should have

7 known this to be the case."  Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); see

8 McGuckin, 974 F.2d at 1060.

9        C.  California Negligence by a Health Care Provider

10      In California, liability ensues for "a negligent act or omission to act by a health care provider

11 in the rendering of professional services, which act or omission is the proximate cause of a personal

12 injury." Cal. Civ. Proc. Code § 340.5(2).  "The elements of a cause of action in tort for professional

13 negligence are: (1) the duty of the professional to use such skill, prudence and diligence as other

14 members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate

15 causal connection between the negligent conduct and the resulting injury; and (4) actual loss or

16 damage resulting from the professional's negligence."  Burgess v. Superior Court, 2 Cal. 4th 1064,

17 1077 (Cal. 1992) (citation and internal quotation marks omitted).

18 II.  Defendant Dr. Shaw

19      A.  Allegations

20      In his complaint, which is signed under the penalty of perjury, plaintiff alleges as follows

21 with respect to defendant Dr. Shaw:

22      1. In October 2016, plaintiff began having pain in his left elbow that radiated down to his

23 hand.  The pain was so severe that it interfered with his sleep, grip, and mobility because he was

24 unable to use his walker.  At the time, Dr. Shaw was his primary care provider,

25      2. On October 14, 2016, plaintiff sent a written request for treatment from Dr. Shaw

26 which went unanswered.  Plaintiff sent a second request for treatment on October 17, which also

27 went unanswered.  A third request was submitted on October 20, and, in response, plaintiff was

28 granted access to the medical unit on October 21.  Plaintiff reported his pain and mobility

1  problems to an unidentified staff member and was told an appointment with Dr. Shaw would be

2  scheduled.

3       3.  On November 7, 2016, plaintiff submitted a fourth request for medical treatment.  On

4  November 9, plaintiff was again granted access to the medical facility.  There he was told he

5  would see Dr. Shaw and a rheumatologist, Dr. Vo, on November 15.

6       4.  Plaintiff did meet with Dr. Shaw and Dr. Vo on November 15.  Plaintiff explained to

7  Dr. Shaw that he was suffering extreme pain in his left elbow which had only gotten worse over

8  the passage of time.  Plaintiff also indicated the pain was causing him mobility problems.

9  Defendant Dr. Shaw told plaintiff that he would follow up with the rheumatologist and

10  neurologist.

11      5.  Plaintiff met with Dr. Shaw on December 12, 2016 and explained that his problems

12  had not improved.  Dr. Shaw opined that the cause of the pain could be a ligament sprain,

13  arthritis, inflammation or tendonitis, but conducted no tests.  Instead, Dr. Shaw referred plaintiff

14  to a "procedure clinic."

15      6.  Plaintiff was seen by neurologist Dr. Koshy on December 27.  Dr. Koshy

16  recommended Gabapentin and to repeat "NCS / EMG," which are electrical tests of nerves and

17  muscles.  However, plaintiff was not provided Gabapentin and the electrical tests were not

18  conducted.  Dr. Koshy also recommended that a splint and physical therapy be considered,

19  however neither were provided.

20      7.  On January 8, 2017, plaintiff filed written notice to Dr. Shaw indicating his left arm

21  still hurt and he would like a brace or something similar.  Nothing was provided.

22      8.  Plaintiff met with Dr. Shaw on January 17.  Dr. Shaw reviewed the notes of Dr.

23  Koshy's examination.  Plaintiff advised Dr. Shaw that Dr. Koshy indicated a splint could help

24  with the pain, but a splint was not provided.  Dr. Shaw referred plaintiff to "Physical Medicine

25  and Rehabilitation."  Plaintiff never saw anyone for "Physical Medicine and Rehabilitation."

26      9.  On January 27, plaintiff received a steroid injection at the "procedure clinic" from Dr.

27  Mathis.

28  /////

1    10.  Plaintiff saw Dr. Shaw on February 6, 2017.  Plaintiff explained that the steroid

2    injection only worked for a few hours and other than that his pain had not subsided.  Nothing was

3    done or provided.

4    11.  Plaintiff saw Dr. Vo on February 21.  Dr. Vo determined the pain in his left arm was

5    not related to Reynaud's Syndrome.

6    12.  On June 29, 2017, defendant Shaw prescribed capsaicin cream.

7    13.  On July 11, 2017, plaintiff requested an ace bandage, heat-gel or something to

8    alleviate his pain and mobility problems.  In response, Tylenol was provided, but it did not help.

9    14.  On July 13, plaintiff requested in writing that he be given an X-ray.  None was

10   provided.

11   15.  Plaintiff complained again in writing on August 10, 2017 of continued pain and

12   mobility problems.  Nothing was done.

13   16.  Dr. Shaw prescribed Gabapentin on August 30.

14   17.  On September 4, 2017 plaintiff filed a prisoner grievance concerning the care he had

15   received with respect to his left arm.

16   18.  On October 5, 2017, Dr. Shaw ordered an X-ray of plaintiff's left arm.  The X-ray

17   was taken October 9 and revealed that his left elbow had sustained a fracture.  On October 17, Dr.

18   Shaw ordered that plaintiff be permitted to use an arm sling.

19   18.  Plaintiff was sent to see an orthopedist on November 14, 2017.  The orthopedist told

20   plaintiff that because of the delay in diagnosis, there was nothing he could do as plaintiff's broken

21   bone had nearly healed.

22   B.  Eighth Amendment

23   Defendants argue Dr. Shaw was not at least deliberately indifferent to the condition of

24   plaintiff's left arm.  Plaintiff's chief complaint is that Dr. Shaw failed to order an x-ray until about

25   one year after plaintiff first reported the pain in his left arm.  In his declaration, Dr. Shaw

26   addresses this as follows:

27          In October 2016, Plaintiff complained of pain in his left elbow and
             related symptoms. . .  This request focused on Plaintiff's pain in his
28           left arm, but also noted various other conditions, including low back

6

pain, asthma, and a request for a flu shot.  Plaintiff did not inform any health care provider that he had struck or acutely injured his elbow.  There was no bruising present at or near plaintiff's elbow.

In assessing the possibility of a fracture, I am generally looking for a report of acute injury, swelling and/or bruising, physical deformity, or a decrease in range of motion.  In the absence of any of those factors, the community standard of care does not require the use of X-rays, or other imaging studies to assess the presence of a fracture.

Plaintiff did not report acute injury, swelling and/or bruising, physical deformity, or a decrease in range of motion at any time in association with his complaints of elbow pain.  As a result, I did not believe Plaintiff had likely sustained a fracture. . .

Particularly in assessing Plaintiff, I noted that a number of other factors were the more likely causes of Plaintiff's ongoing complaints of pain.  Notably, Plaintiff has regularly complained of pain and numbness in his left arm, hand, and wrist.  If I ordered an X-ray every time plaintiff complained of pain, I would be ordering X-rays every month.  For this reason, I must consider other factors which are indicative of a fracture. . .

Plaintiff submitted numerous [requests for medical care] regarding his elbow pain and numerous other complaints.  Plaintiff was examined on several occasions including by myself, and his pain was regularly attributed to his cervical radiculitis, Raynaud's Syndrome, carpal tunnel syndrome, or other unknown neurological causes.  Plaintiff was prescribed Gabapentin, a neurological pain medication, in August 2017.  Again, this reflects the fact that I and Plaintiff's other health care providers, attributed his complaints of pain to his ongoing neurological conditions.

ECF No. 49-3 at 3-4.  Plaintiff does not meaningfully dispute any of the above.

As indicated above, Dr. Shaw changed course in October, 2017 and ordered an X-ray.  Id. at 5.  The X-ray revealed a "nondisplaced radial head fracture which may be subacute."  "No evidence of joint effusion."  ECF. No. 57 at 79.  Dr. Shaw does not indicate why he changed his mind concerning the X-ray and there is no evidence plaintiff's condition changed rendering an X-ray a more medically appropriate course of action other than the fact that the treatments up until that point had been ineffective and there was still no clear diagnosis for plaintiff's left arm pain.

After a follow up X-ray on December 6, 2017, the radiologist compared the results to the October 9, 2017 X-ray:

/////

/////

1
2

> FINDINGS:  Barely perceptible radial head fracture suggestive of healing.  No new fracture or dislocation.  No joint effusion.  No radiopaque foreign body.

3

> IMPRESSION:  Near completely healed radial head fracture.

4    ECF No. 57 at 132.

5          Viewing all evidence before the court in the light most favorable to plaintiff, the court

6    cannot find there is a genuine issue of material fact as to whether defendant was deliberately

7    indifferent to plaintiff's left arm problems by failing to order an X-ray until October, 2017.  There

8    is no evidence rebutting Dr. Shaw's expert opinion that an X-ray was not within the standard of

9    care, and his explanation as to why not is reasonable.

10         As indicated above, plaintiff alleges his requests for medical treatment went unanswered

11   on certain occasions or that responses to his requests were delayed.  But this is not automatically

12   attributable to Dr. Shaw as plaintiff seems to suggest.  Simply because plaintiff requests to see Dr.

13   Shaw does not necessarily mean it is Dr. Shaw's fault that such visits did not occur without any

14   evidence supporting it was his fault.  Also, as reflected in Dr. Shaw's affidavit, a request for a

15   visit at certain times prompted Dr. Shaw to review plaintiff's medical records to determine if a

16   change in treatment was warranted.  From the record before the court, including the contents of

17   numerous medical records submitted by both parties detailing attempts by several medical

18   professionals to treat plaintiff's issues including issues with plaintiff's left arm, it is clear that, on

19   the whole, plaintiff's problems with his left arm were not ignored by Dr. Shaw.

20         It appears plaintiff claims that at certain times, Dr. Shaw should have taken some other

21   action other than order an X-ray, such as provide a brace or refer plaintiff to an orthopedic

22   specialist.  However, plaintiff fails to point to any evidence indicating failure to provide plaintiff

23   with a brace, etc. caused plaintiff any injury or that failure to take such action amounts to

24   deliberate indifference.  Again, even after it was determined that plaintiff had sustained a fracture

25   to his left elbow, essentially no action was taken.  In his opposition, plaintiff asserts that when he

26   was examined on November 14, 2017 by an orthopedic surgeon after it had been determined that

27   plaintiff had sustained a fracture, the surgeon indicated rehab was needed.  ECF No. 57 at 13.

28   /////

1    However, in the report generated after the visit, no rehabilitation plan or even exercises are

2    identified. Id. at Ex. L.[1]

3         As indicated above, plaintiff indicates that he was in pain and notes that plaintiff was only

4    provided medication for pain relief, such as Tylenol, Gabapentin and a steroid injection on a few

5    occasions over the course of approximately one year.  But, plaintiff fails to indicate what other

6    medications should have been provided and point to any evidence indicating a failure to provide

7    such medications amounts to deliberate indifference.  Notably, plaintiff does not indicate that he

8    requested any pain medication other than the pain medication provided and was denied.

9         Based on all the evidence before the court, the court finds that there is no genuine issue of

10   material fact as to whether defendant Shaw was at least deliberately indifferent to plaintiff's left

11   arm issues.  Furthermore, there is a no genuine issue of material fact as to whether Dr. Shaw's

12   failure to order an X-ray caused plaintiff any actionable injury as there is no evidence indicating

13   that an earlier diagnosis of plaintiff's fractured elbow would have resulted in reduced pain or

14   faster healing.  In this respect it is worth noting that plaintiff does not indicate his condition has

15   improved with respect to his left arm and there is evidence in the record that plaintiff was still

16   complaining of elbow pain as late as January 30, 2018.  ECF No. 57 at 134.  Finally, there is no

17   genuine issue of material fact as to whether Dr. Shaw's other actions, such as not providing

18   plaintiff a brace, did cause plaintiff actionable injury.

19        B.  Negligence

20        As indicated above, Dr. Shaw provides expert testimony that his treatment was within the

21   standard of care for a California physician and his testimony is mostly corroborated by Dr. Ikegbu

22   (see, 10-11 supra), especially with respect to the ordering of an X-ray.  ECF No 49-4.  There is no

23   expert opinion refuting Dr. Shaw or Dr. Ikegbu's testimony.  As indicated above, Dr. Shaw did

24   eventually order that plaintiff's left arm be X-rayed and that the X-ray revealed a fracture.  But, there

25   /////

26

27   [1]  There is a notation that reads "ELBOW RADIAL FRACTURE:  REHAB EXERCISES" but,
     again, no exercises or rehabilitation plan are identified after the notation nor is any other post-
28   visit treatment plan. Id.

9

1    is nothing before the court suggesting that the delay in the ordering of the X-ray was the result of

2    negligence.

3           As with plaintiff's Eighth Amendment claim, there is no genuine issue of material fact as to

4    whether any of Dr. Shaw's other actions or inactions was the proximate cause of any actionable injury

5    suffered by plaintiff.

6           For these reasons, defendants are entitled to summary judgment with respect to plaintiff's

7    negligence claim against Dr. Shaw.

8    III.   Defendant Dr. Ikegbu

9           A.   Allegations

10          In his complaint, plaintiff alleges he submitted a grievance concerning the treatment he

11   had received for the pain in his left arm, and that defendant Dr. Ikegbu interviewed plaintiff as to

12   the contents of the grievance on September 26, 2017.  During the interview, plaintiff told Dr.

13   Ikegbu about his extreme pain, mobility impairment and the lack of treatment he had received

14   from Dr. Shaw over the past year including that Dr. Shaw never ordered X-rays.  Dr. Ikegbu took

15   no action with respect to plaintiff and denied his grievance.

16          B.   Eighth Amendment

17          Defendants argue that defendant Dr. Ikegbu was not deliberately indifferent to the

18   condition of plaintiff's left arm.  Defendants have provided a copy of the grievance submitted by

19   plaintiff.  In the grievance plaintiff indicates that "over the pas[t] months, I've been suffering

20   severe burning pain + numbness in my left arm, elbow + hand," and "none of the treatment thus

21   far [has] help[ed] the pain . . ."  ECF No. 49-4 at 31 & 33.  Plaintiff also indicated the pain,

22   burning and numbness impacted his daily activities.  Id. at 33.

23          In the grievance, plaintiff provided the following background concerning his condition:

24          . . . [I]t has been noted through x-rays that I have cervical arthrosis
             the x-ray shows one of my spine neck disk is pinching the nerve
25           affecting my left arm, I've been given shots, meds, electric shocks,
             physical therapy.  Neither has help[ed] the burning [which] is at a 8
26           to 10 level, it seem as though post spinal surgery and maybe Valley
             Fever is contributing to these problems.
27   Id.

28   /////

10

1      Plaintiff sought the following relief in his grievance:

2              Specialty treatment in cervical + spinal arthrosis area as well as . . .
               nerve specialist to address burning, etc.; need test for possible carpel
3              tunnel given weak left hand grip + numbness + pain, also if my
               doctor has run out of treatment options I'm requesting input from the
4              CP+S + the [Chief Medical Officer].

5      Id. at 31 & 33.

6      In her affidavit, Dr. Ikegbu indicates as follows:

7              In September 2017, I reviewed one of plaintiff's health care appeals,
               complaining that he was not receiving adequate treatment for
8              complaints of elbow pain. I reviewed Plaintiff's medical records. I
               noted Plaintiff's history of complaints of pain and numbness in the
9              left hand and arm. I noted Plaintiff's ongoing treatment for a number
               of neurological conditions associated with Plaintiff's complaints of
10             pain. Nothing in the records suggested to me that Plaintiff has
               sustained an elbow fracture. Plaintiff's full range of motion and lack
11             of bruising suggested that such a fracture was unlikely.

12             I denied the appeal, indicating that no intervention was necessary. . .

13             In assessing the possibility of a fracture, I am generally looking for a
               report of acute injury, swelling and/or bruising, physical deformity,
14             or a decrease in range of motion. In the absence of any of those
               factors, the community standard of care does not require the use of
15             X-rays, or other imaging studies to assess the presence of a fracture.

16             Plaintiff did not report acute injury, swelling and/or bruising,
               physical deformity, or a decrease in range of motion at any time in
17             association with his complaints of elbow pain. As a result, I did not
               believe Plaintiff likely sustained a fracture.
18
               I did not intervene in Plaintiff's care, or order an X-ray of plaintiff's
19             elbow, because I did not believe an X-ray was medically indicated.

20     Id. at 2-3.  Plaintiff does not meaningfully dispute any of the above.

21             Plaintiff's grievance was denied on October 5, 2017. Id. at 35.

22             The court agrees with defendants that there is no genuine issue of material fact as to

23     whether Dr. Ikegbu was at least deliberately indifferent to plaintiff's problems with his arm. As

24     with Dr. Shaw, plaintiff's primary complaint with respect to Dr. Ikegbu is that she did not order

25     an X-ray of plaintiff's left arm. Dr. Ikegbu reviewed plaintiff's complaints, reviewed plaintiff's

26     medical records and then spoke with plaintiff. Dr. Ikegbu provides expert testimony which is

27     reasonable that, given all of the circumstances, an X-ray was not within the standard of care.

28     Plaintiff does not provide any expert testimony to refute Dr. Ikegbu's. It is worthy of note that

11

1   Dr. Shaw ordered an x-ray shortly after Dr. Ikegbu completed her review.  But, Dr. Shaw's

2   decision to order an X-ray, on the record before the court, indicates nothing more than a

3   difference of opinion which, as indicated above, cannot establish deliberate indifference.

4   Also, plaintiff fails to point to anything suggesting Dr. Ikegbu caused plaintiff any

5   actionable harm.  Dr. Ikegbu completed her review of plaintiff's extensive medical history and

6   condition on October 5, 2017.  Dr. Shaw ordered that day that plaintiff's arm be X-rayed.  Even

7   after it was revealed plaintiff had sustained an elbow fracture, no treatment was prescribed.  There

8   is nothing before the court that any action taken by Dr. Ikegbu would have resulted in plaintiff not

9   suffering from an actionable injury.

10   For all of these reasons, defendants' motion for summary judgment with respect to

11   plaintiff's Eighth Amendment claim against Dr. Ikegbu should be granted.

12   B.   Negligence

13   Defendants are entitled to summary judgment with respect to plaintiff's negligence claim

14   against Dr. Ikegbu as well.   There is no evidence before the court that Dr. Ikegbu ever acted in a

15   manner inconsistent with the skill, prudence and diligence other California physicians commonly

16   possess and exercise.  Also, as with plaintiff's Eighth Amendment claim, there is no evidence

17   suggesting a proximate causal connection between Dr. Ikegbu's conduct and actionable injury.

18   IV.  Conclusion

19   For all of the foregoing reasons, the court will recommend that defendants' motion for

20   summary judgment be granted and this case be closed.

21   In accordance with the above, IT IS HEREBY ORDERED that the Clerk of the Court

22   assign a district court judge to this case.

23   IT IS HEREBY RECOMMENDED that:

24   1. Defendants October 14, 2020 motion for summary judgment (ECF No. 49) be granted;

25   and

26   2. This case be closed.

27   These findings and recommendations are submitted to the United States District Judge

28   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 27, 2021

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
news2010.msj

13